IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| JAY MAU, etc., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) No. 10 C 1411 |
| | ) |
| L.A. FITNESS INTERNATIONAL, | ) |
| LLC, etc., | ) |
| | ) |
| Defendant. | ) |

MEMORANDUM OPINION AND ORDER

Jay Mau ("Mau"), individually and as the proposed representative of a putative class, has filed a six-count complaint against L.A. Fitness International, LLC. ("Fitness"), claiming that Fitness wrongfully imposed a uniform early termination fee provision on its clients under its fitness services agreements ("Agreements") in violation of Illinois law. Fitness has moved for summary judgment under Fed. R. Civ. P. ("Rule") 56, and the motion has been fully briefed. For the reasons stated here, Fitness' motion is denied and its so-called "Voluntary Termination Clause" (hereafter simply "Termination Clause") is held to impose an unenforceable penalty.

**Summary Judgment Standard**

Every Rule 56 movant bears the burden of establishing[1] the

---

[1] At the summary judgment stage, of course, Mau need not "establish" or "show" or "prove" anything, but must merely demonstrate that a genuine issue of material fact exists. This opinion employs those terms only because the caselaw generally uses that terminology, but it imposes on Mau the lesser burden described earlier in this footnote.

absence of any genuine issue of material fact (Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986)). For that purpose courts consider the evidentiary record in the light most favorable to nonmovants and draw all reasonable inferences in their favor (Lesch v. Crown Cork & Seal Co., 282 F.3d 467, 471 (7th Cir. 2002)). But a nonmovant must produce more than "a mere scintilla of evidence" to support the position that a genuine issue of material fact exists (Wheeler v. Lawson, 539 F.3d 629, 634 (7th Cir. 2008)) and "must come forward with specific facts demonstrating that there is a genuine issue for trial" (id.).

Ultimately summary judgment is warranted only if a reasonable jury could not return a verdict for the nonmovant (Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). What follows then is a summary of the facts,[2] viewed of course in the light most favorable to nonmovant Mau--a requirement applied within any limitations created by the extent of his compliance (or noncompliance) with the strictures of this District Court's LR 56.1, adopted to implement Rule 56.

---

[2] This District Court's LR 56.1 requires parties to submit evidentiary statements and responses to such statements to highlight which facts are disputed and which facts are agreed upon. This opinion cites to Fitness' LR 56.1 statement as "F. St. ¶ --," to Mau's LR 56.1 statement as "M. St. ¶ ---" and to Mau's responses as "M. Resp. ¶ --." Where Mau does not dispute Fitness' original statement, this opinion cites only that original statement.

**Factual Background**

On October 2, 2009 then 71-year-old Mau entered into an Agreement with Fitness for himself and his fiancee (M. St. ¶1). That contract entitled Mau and his fiancee to four personal training sessions per month at Fitness' health clubs for a period of 12 months (id. ¶2). In exchange for the promised services, Mau made an initial payment of $170 ($50 administrative fee plus $120 for the first month's training sessions) and agreed to have his 11 additional monthly payments of $120 each charged to his credit card (F. St. ¶7). In part Fitness' printed form contained this Termination Clause:

> Voluntary Termination: Client may voluntarily terminate this Agreement at any time by doing the following: (1) giving LAF 30 days' written notice of cancellation to be sent by registered mail, return receipt requested, and (2) paying a fee equal to 50% of the remaining balance as of the notice, in addition to any and all fees incurred, including, but not limited to, any late fees, return fees, collection fees, etc.

Mau scheduled personal training sessions for himself and his fiancee on four occasions (M. St. ¶5). Mau found his October 7 session unsatisfactory because the trainer did not adequately communicate to him how he should exercise (id. ¶15). On October 9 the trainer that was scheduled to work out with Mau did not show up, and an uncertified personal trainer worked out with Mau instead (id. ¶16). Next Mau and his fiancee experienced physical pain after their workout with a trainer on October 16 (id. ¶17). Finally, on October 21 no trainer appeared at Mau's

3

scheduled personal training appointment (id. ¶18).

On October 28 Mau cancelled his Agreement as a result of what he viewed as poor performance by Fitness (M. St. ¶19). Fitness charged $660 to Mau's credit card account and provided Mau with a corresponding "Receipt for Training Buyout" (F. St. ¶17; M. St. ¶21). Soon after that Mau called Fitness' corporate representative to demand a full refund of the $660 fee (M. Resp. ¶12). After that demand was refused, Mau lodged a complaint with the Better Business Bureau in November 2009 (M. St. ¶24). Just a few days later Fitness offered Mau a refund of $120, which he accepted under protest (M. St. ¶¶25-26).

**Enforceability of the Termination Clause**

On Fitness' current motion the core legal dispute[3] is whether the Termination Clause in the Agreement is enforceable. That being so, both Mau and Fitness focus too much on legal terminology and formal legal tests, rather than on whether the

---

[3] As Fitness' original motion to dismiss helpfully points out, even though Mau's complaint contains six counts he has just a single claim for relief arising out of one alleged wrong (F. Mot. To Dismiss Mem. 4-5). In that respect the clear (and correct) teaching of cases such as NAACP v. Am. Family Mut. Ins. Co., 978 F.2d 287, 292 (7th Cir. 1992), and the equally clear message of Rule 10(b) as to the proper use of counts to set out separate claims (the federal concept) rather than to split a single claim into different "causes of action" that rely on different theories of recovery (the Illinois state practice), both support Fitness' position. At this stage both sides have conformed to Fitness' suggestion, and this opinion will follow their lead in discussing the underlying claim rather than each individual count.

Termination Clause imposes an unenforceable penalty. This opinion will focus squarely on that issue, which is a question of law (Checkers Eight Ltd. P'ship v. Hawkins, 241 F.3d 558, 562 (7th Cir. 2001)).[4]

Our Court of Appeals repeatedly confirms that penalty clauses remain unenforceable under Illinois law (see, e.g., River E. Plaza, LLC. v. Variable Annuity Life Ins. Co., 498 F.3d 718, 722 (7th Cir. 2007)).[5] Fitness argues that whether the Termination Clause is a penalty under Illinois law should be analyzed under an alternative-performance rubric (F. Mem. 3-7). It is of course an odd locution to speak of the compelled payment under the Termination Clause as a kind of "performance"--but even if that label were attached to it, that would not necessarily mean that the type of alternative-performance analysis most comprehensively conducted by the Court in River E. should be employed here or, even if employed, would be dispositive.

---

[4] What the litigants have not addressed, so that this Court does not seek to tackle the question on its own, is whether the "Termination Clause" is applicable at all to the action that Mau took in cancelling the Agreement. Under the circumstances alleged by Mau, any notion that the termination was "voluntary" in the volitional sense connoted by the contractual clause, rather than being reactive to gross nonperformance by Fitness, imposes a real strain on the normal meaning of language--and it should be remembered that contra proferentem principles apply to the construction of Fitness' form contract. It is expected that the issue will be explored hereafter.

[5] Both sides have looked to Illinois substantive law in addressing the current motion (F. Mem. 2; M. Mem. 6). This opinion will follow their lead.

5

Fundamentally an alternative-performance analysis is conducted in response to the suggestion of an "attempt to disguise a provision for a penalty that purports to make payment of the amount an alternative performance under the contract" (Restatement (Second) of Contracts §356 cmt. c (1981)(hereafter cited simply "cmt. c")). As River E., 498 F.3d at 722, quoting cmt. c, says:

> [A] court will look to the substance of the agreement to determine whether...the parties have attempted to disguise a provision for a penalty that is unenforceable....In determining whether a contract is one for alternative performances, the relative value of the alternatives may be decisive.

Of course "the underlying question is whether [a] clause is punitive in nature" (id.). Courts should expect to find non-punitive forms of alternative performance clauses, as opposed to traditional liquidated damage clauses, where "the primary object of an alternative contract is performance, and it thus looks to a continuation of the relationship between the parties, rather than to its termination" (24 Williston on Contracts §65:7 (Richard Lord, ed., 4th ed. 2010)).

This exposition of the alternative-performance analysis makes clear that such an analysis is not really applicable here. First, by definition there was and is no expectation of a continuing relationship between Mau and Fitness--exactly the opposite is true. Mau simply wanted to end his contract with Fitness and presumably find another place to work out, if he

6

chooses to continue to do so.

Surely the situation can more fairly be classified as non-performance (indeed, nonperformance by Fitness rather than by Mau, when his version is credited as it must be on the current motion), rather than alternative performance. For one thing, Mau's actions can be contrasted to the situation in River E., where the borrower and lender may well have had an ongoing financial relationship extending to different loans or new business.

More importantly, Mau's forced payment of a fee under the Termination Clause does not bestow on him the substantial economic benefit realized by the borrower in River E. from prepaying the loan that it had received--a benefit that made that situation a plausible case for alternative performance.[6] Finally, even if an alternative- performance analysis were somehow found to be appropriate here, the fact that the Termination Clause allowed Mau to pay less than the amount he would have owed for the full contract term would not answer the question whether the Termination Clause is a penalty clause. Instead it would demonstrate only that the Termination Clause is

---

[6] River E., 498 F.3d at 721 noted that the prepayment clause at issue there reflected the intent of the parties to balance (1) the concern of the lender in guarding against the risk of lower interest rates and (2) the desire of the borrower to be able to prepay the loan and unburden itself of significant financial debt.

not an "attempt to disguise a provision for a penalty that purports to make payment of the amount an alternative performance under the contract" (cmt c).[7] Proving that negative does not prove that the Termination Clause is enforceable. To address fully "the real question [of] whether the clause is a penalty intended to secure performance" (River E., 498 F.3d at 725), further discussion is required.

In contrast to Fitness' focus on the alternative-performance analysis as a method for assessing whether the Termination Clause is a penalty clause, M. Mem. 6-7 engages in a liquidated damages clause analysis in answering that same question. While Mau's cancellation of the Agreement was surely not a contractual breach, it did represent a significant non-conformity with the terms of the Agreement.[8] Without question the Termination Clause was a means of putting pressure on Mau to adhere to the original terms of the Agreement instead of cancelling the Agreement and

---

[7] Fitness Mem. 6-7 cites three additional cases in purported support of its alternative-performance analogy. But all three of those out-of-circuit cases do not interpret Illinois state law, and each provides a significantly less developed discussion of the alternative-performance analysis than the River E. opinion or this opinion. On top of that, each of those cases is distinguishable on the same basis as is set out in this opinion's discussion of River E.

[8] Fitness Mem. 2-3 contends that because no breach of the contract took place, the Termination Clause cannot be considered a liquidated damages clause and therefore cannot qualify instead as an unenforceable penalty. Nonsense--clearly a contractual provision may be framed as something other than a liquidated damages clause and still be a penalty.

8

refusing to pay Fitness for the use of its personal training services.

Thus the cases comparing liquidated damages for breach with unenforceable penalties might perhaps be thought to provide a useful, if imperfect, analogy here.[9] And in that respect <u>Energy Plus Consulting, Inc. v. Ill. Fuel Co.</u>, 371 F.3d 907, 909 (7th Cir. 2004)(internal quotation marks omitted) most recently recited the test under Illinois law for determining if a contract clause is an enforceable liquidated damages provision as contrasted with an unenforceable penalty:

> In Illinois, a liquidated damages clause is valid and enforceable when: (1) the actual damages from a breach are difficult to measure at the time the contract was made; and (2) the specified amount of damages is reasonable in light of the anticipated or actual loss caused by the breach.

In an instance of over-reliance on his part on the formalistic application of legal tests, Mau contends that because any actual damages caused by future termination could be known at the initial contract date, the Termination Clause is not a valid

---

[9] In that respect <u>River E.</u>, 498 F.3d at 724 recognized that "it is conceivable that a state might use the law of liquidated damages as some sort of analogy to determine whether [a]...clause is a penalty as opposed to alternative performance." And in discussing this Court's earlier decision in <u>Auto. Fin. Corp. v. Ridge Chrysler Plymouth, L.L.C.</u>, 219 F.Supp.2d 945 (N.D. Ill. 2002), <u>River E.</u> emphasized, as this Court had, that "the real question is whether the clause is a penalty intended to secure performance" and stressed that this Court "was careful to note that it was invoking a 'comparison' to the law of liquidated damages, and called cases comparing liquidated damages to penalties 'an apt analogy'" (<u>id</u>.).

9

liquidated damages provision and is therefore unenforceable. But that misses the mark. Instead the potential for such knowledge simply makes a conventional liquidated damages test an imperfect tool for analyzing the Termination Clause here. No matter what label is attached to the Termination Clause, Illinois law is primarily concerned instead with whether contract provisions serve as a "threat used to secure performance" (Med+Plus Neck & Back Pain Ctr., S.C. v. Noffsinger, 311 Ill.App.3d 853, 860, 726 N.E.2d 687, 693 (2d Dist. 2000)). In that regard the reasonableness inquiry under the second prong of the liquidated damages analysis (see, e.g., United Order of Am. Bricklayers & Stone Masons Union No. 21 v. Thorleif Larsen & Son, Inc., 519 F.2d 331, 333 (7th Cir. 1975)) does provide an analogy that helps to shed light on the nature of penalty clauses.

Lake River, 769 F.2d at 1290 succinctly articulated the standard, since then consistently applied by our Court of Appeals, that a contract clause is unreasonable and is hence a penalty when the amount required to be paid by the clause "is invariant to the gravity of the breach." That is so because "[i]f the amount of damages is invariant to the gravity of the breach, the clause is probably not a reasonable attempt to estimate actual damages and thus is likely a penalty" (Checkers Eight, 241 F.3d at 562. Or put another way, "[t]he element common to most liquidated damages clauses that get struck down as

penalty clauses is that they specify the same damages regardless of the severity of the breach" (XCO Int'l Inc. v. Pac. Scientific Co., 369 F.3d 998, 1004 (7th Cir. 2004)).

Fitness spills considerable ink in arguing that the amount that Mau would be required to pay under the terms of the Termination Clause would vary with the loss to Fitness calculated by reference to the time remaining on the contract, as well as to Fitness' variable costs assertedly incurred because of losing Mau's business for that time period. But that accounts only for temporal variability--importantly, it ignores the Termination Clause's invariability in terms of the level of Fitness' own performance--or in this case, nonperformance.

Fitness' line of analysis, which might carry persuasive force if what was involved here were a conventional one-to-one contract for the provision of goods and services that was then breached by the purchaser, breaks down in the real-world universe of Fitness' business operations. To Fitness the persons who respond to its advertisements and sign its pre-prepared standard form contract are totally fungible[10]--and indeed the telltale clue is provided by examining the concept of "expectation interest" in the context of the Fitness operation.

In that regard Mau has adduced evidence (1) that nearly one-

---

[10] This is not said by way of criticism--it is simply a recognition of the nature of the beast.

11

fifth of personal training members will cancel their Agreements early and (2) that for each member who cancels early, five new ones are waiting to fill their places (M. St. ¶¶12-13). Based on its actual experience, Fitness' "expectation interest" does not lead it to staff its workforce of trainers as though all members of the fungible group are going to stay with it for their full terms. Precisely the opposite is true--in fact, Mau's experience indicates that Fitness' staffing arrangements are inadequate to meet even its experience-based expectation of a lower demand.

That then explains why Fitness' proposed approach of extending the concept of liquidated damages in the conventional one-to-one contractual environment to the situation here is grounded on a false analogical base. And with that foundation removed as structurally unsound, Fitness' proposed analytical edifice collapses. Hence this opinion returns to the teaching of our Court of Appeals that the proper yardstick for measuring whether a contractual provision is or is not a penalty, so that a "yes" answer renders it unenforceable, looks to the earlier-identified question of whether the stated "damages are invariant to the breach" (or in this case, to what Fitness might try to characterize as a breach) of the contractual relationship.

It will be remembered that according to Mau he "only canceled due to [Fitness'] breach of the FSA" (M. Mem. 10)--a claim backed up by specific factual evidence that Fitness failed

to provide Mau with adequate personal training services. Unquestionably the Termination Clause does not take account of those facts.

In fact, the fee set by the Termination Clause does not account in any way for of the quality or lack of quality of Fitness' performance. It is precisely the same for an individual who received high quality personal training service at well-maintained facilities as for an individual who (like Mau) received deficient (or sometimes no) performance, or for someone who had been unable to access a Fitness workout facility at all as a result of Fitness' own deficient conduct.[11] And that underscores the critical factor that differentiates the analysis required for Fitness' relationship with its customer group from that applicable to the classical one-to-one contractual relationship.

In sum, such invariance to the gravity of the breach conclusively demonstrates that the Termination Clause is a penalty intended to secure performance.[12] And of course that

---

[11] If it were to be argued that the focus of the inquiry must instead be on Mau's "breach" (really a fiction, given the reasons he adduces for his termination of the relationship), the gravity of that so-called "breach" would be the inverse of Fitness' earlier breach of its own obligations. And so the analysis of "damages invariant to the breach" would remain the same.

[12] It might perhaps be suggested that fashioning a rule that requires variance of a termination fee with the enforcing party's performance or nonperformance is unnecessary, for the

13

necessitates the denial of Fitness' Rule 56 motion.

## Conclusion

For the foregoing reasons, Fitness' Rule 56 motion for judgment as a matter of law is denied. Because as stated earlier the issue of penalty vel non is a question of law, that denial has been accompanied by an affirmative answer to that question, so that the Termination Clause imposes a penalty and is hence unenforceable. Finally, a status hearing is set for 8:30 a.m. November 15, 2010 to discuss the future course of this litigation.

_____
Milton I. Shadur
Senior United States District Judge

Date: November 10, 2010

---

party suffering poor performance could break the contract and sue the other party for damages. But that alternative would inappropriately put the onus on the party who suffered the poor performance.